NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1821-17T3
                    A-1889-17T3

DELAWARE RIVERKEEPER
NETWORK, and MAYA VAN
ROSSUM, DELAWARE
RIVERKEEPER,

      Appellants,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

      Respondent.

_____

STONY BROOK-MILLSTONE
WATERSHED ASSOCIATION,
SAVE BARNEGAT BAY, RARITAN
HEADWATERS ASSOCIATION,
NY/NJ BAYKEEPER, HACKENSACK
RIVERKEEPER, and ASSOCIATION
OF NEW JERSEY ENVIRONMENTAL
COMMISSIONS,

      Appellants,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

      Respondent.

> **APPROVED FOR PUBLICATION**
>
> **March 18, 2020**
>
> **APPELLATE DIVISION**

_____

Argued November 20, 2019 – Decided March 18, 2020

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from the New Jersey Department of Environmental Protection.

Edward L. Lloyd argued the cause for appellants Delaware Riverkeeper Network, Maya Van Rossum, Delaware Riverkeeper, Stony Brook-Millstone Watershed Association, Save Barnegat Bay, Raritan Headwaters Association, NY/NJ Baykeeper, Hackensack Riverkeeper and Association of New Jersey Environmental Commissions in A-1821-17 (Columbia Law Environmental Clinic, Morningside Heights Legal Services, attorneys; Edward L. Lloyd and Susan J. Kraham, of counsel and on the briefs).

Eastern Environmental Law Center, attorneys for appellants Stony Brook-Millstone Watershed Association, Save Barnegat Bay, Raritan Headwaters Association, NY/NJ Baykeeper, Hackensack Riverkeeper and Association of New Jersey Environmental Commissions in A-1889-17 (Dan Greenhouse and Aaron Kleinbaum, of counsel and on the briefs; Raghava Murthy, on the briefs).

Jacobine K. Dru, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Jacobine K. Dru and Stephanie Raye Carney, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

KOBLITZ, P.J.A.D.

2

The New Jersey Department of Environmental Protection (DEP)[1] issued a renewal of the Tier A[2] municipal separate storm sewer system (MS4) New Jersey Pollutant Discharge Elimination System (NJPDES) general permit on November 9, 2017 (the MS4 permit). The permit authorizes the discharge of stormwater from MS4s owned or operated by approximately 457 Tier A municipalities.

In this consolidated appeal,[3] Delaware Riverkeeper Network, Maya Van

---

[1] To assist in understanding the many initials we use, we present this list as well as a reminder when the abbreviation is first used and in section headings:

best management practices (BMPs)
Clean Water Act (CWA)
Environmental Protection Agency (EPA)
maximum extent practicable (MEP)
municipal stormwater management plan (MSWMP)
National Pollutant Discharge Elimination System (NPDES)
New Jersey Department of Environmental Protection (DEP)
New Jersey Pollutant Discharge Elimination System (NJPDES)
notice of intent (NOI)
optional measures (OMs)
statewide basic requirements (SBRs)
stormwater management program (SWMP)
stormwater pollution prevention plan (SPPP)
municipal separate storm sewer systems (MS4)
total maximum daily load (TMDL)
wasteload allocation (WLA)

[2] Tier A municipalities, the focus of this general permit, are located within the more urbanized regions of the state or along or near the Atlantic coast, while Tier B municipalities tend to be located in more rural and non-coastal areas. N.J.A.C. 7:14A-25.3.

[3] We granted the DEP's motion to consolidate the appeals on April 23, 2018.

Rossum and Delaware Riverkeeper in one appeal, and Stony Brook-Millstone Watershed Association, Save Barnegat Bay, Raritan Headwaters Association, NY/NJ Baykeeper, Hackensack Riverkeeper and Association of New Jersey Environmental Commissions in the other (collectively appellants), challenge the issuance of the MS4 permit claiming that it does not comply with federal and state law. They maintain that the permit does not include effluent limits and monitoring as required by federal law, and that the DEP's inclusion of best management practices (BMPs) rather than effluent limits was a further violation of applicable law. Appellants also argue that the permit requirements are neither "clear, specific, and measurable," nor provide for meaningful review and that the DEP violated federal law by issuing permits without the public's involvement. Acknowledging our deferential standard of review, we affirm the final agency decision.

## I. Permit History.

Under the Clean Water Act (CWA), the discharge of pollutants is illegal. 33 U.S.C. § 1311. Through the National Pollution Discharge Elimination System (NPDES), 33 U.S.C. § 1342, either the Environmental Protection Agency (EPA) or an EPA-approved state, such as New Jersey, may issue permits exempting a discharge from this prohibition. The state program must meet specific requirements, including incorporating certain provisions of the NPDES

regulations, and must be approved by the EPA. Ibid.; EPA State Program Requirements, 40 C.F.R. § 123.25(a)(15) (2019); EPA Administered Permit Programs: The National Pollutant Discharge Elimination System, 40 C.F.R. § 122.44 (2019). If NPDES permitting authority is transferred to an approved state, then state officials, not the EPA, have the primary responsibility for reviewing and approving the permits, "albeit with continuing EPA oversight." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 650 (2007).

As an EPA-approved state, New Jersey must set water quality standards by first assigning a "use" to a navigable body of water, such as propagation of fish or recreational purposes, and then developing criteria to protect that use and ensure that higher quality waters do not degrade to the minimally accepted standard. 33 U.S.C. § 1313(c)(2)(A); N.J.A.C. 7:9B-1.5(a)(6), (d)(1)(v); N.J.A.C. 7:9B-1.12. All water quality standards are subject to EPA review. 33 U.S.C. § 1313(a), (b). The criteria assigned to bodies of water are expressed in either "constituent concentrations, levels, or narrative statements." EPA Water Quality Standards, 40 C.F.R. § 131.3(b) (2019); N.J.A.C. 7:9B-1.4. "When the criteria are met, water quality will generally protect the designated use." N.J.A.C. 7:9B-1.4.

In 1987, Congress amended the CWA to require NPDES permits for MS4 stormwater discharge. 33 U.S.C. § 1342(p). An MS4 is a conveyance or system

5

of conveyances owned or operated by a municipality that carries stormwater that ultimately discharges to waters of the state (including both surface water and groundwater). N.J.A.C. 7:14A-1.2. An MS4 includes curbs, gutters, ditches, manmade channels, storm drains, catch basins, municipal streets or roads with drainage systems that are not combined sewers and are not part of a publicly owned treatment works such as a sewage treatment system. 40 C.F.R. § 122.26(b)(8); N.J.A.C. 7:14A-1.2.

The EPA identifies stormwater discharge as a significant source of water pollution. See, e.g., 40 C.F.R. § 122.30(c). Stormwater discharge is generated when rain or melting snow "flow[s] over land or impervious surfaces, such as paved streets, parking lots, and building rooftops, and does not soak into the ground." EPA, NPDES Stormwater Program, https://www.epa.gov/npdes/ npdes-stormwater-program (last visited Feb. 11, 2020). MS4 stormwater discharges are regulated through federal and state rules. 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26; N.J.A.C. 7:14A-25.1 to -25.10.

The EPA takes a two-phased approach to implementing a program to address stormwater discharges. 33 U.S.C. § 1342(p)(4). Phase II, applicable here, addresses requirements for small MS4s serving a population of less than 100,000. 40 C.F.R. §§ 122.26, 122.34. Separate storm sewer systems such as those serving military bases, universities, large hospitals or prison complexes,

and highways are also included in the definition of a "small MS4." Id. § 122.26(b)(16). The DEP implemented NJPDES Phase II rules in its regulations. N.J.A.C. 7:14A-6.2(b)(1).

Municipal stormwater discharge is "highly intermittent," "usually characterized by very high flows occurring over relatively short time intervals," and "depend[s] on the activities occurring on the lands." National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990, 48,038 (Nov. 16, 1990) (codified at 40 C.F.R. § 122.26). It is difficult to discern the amount of pollutant that any one discharger contributes to a body of water because municipalities have so many outfalls, or discharge points, leading into the waters. See 40 C.F.R. § 122.26(b)(5), (9) (outlining minimum diameters of pipes in major MS4 outfalls). Because of the nature of municipal stormwater discharges, Congress adopted a flexible approach to the control of pollutants in MS4s. See NPDES Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. at 48,038.

The federal rules require that NPDES permits issued to small MS4s include "clear, specific, and measurable terms" to "reduce the discharge of pollutants from the MS4 to the maximum extent practicable (MEP), to protect water quality, and to satisfy the appropriate water quality requirements of the [CWA]." 40 C.F.R. § 122.34(a). "Such terms and conditions may include

narrative, numeric, or other types of requirements (e.g., implementation of specific tasks or [BMPs], BMP design requirements, performance requirements, adaptive management requirements, schedules for implementation and maintenance, and frequency of actions)." Ibid.

The NPDES permit must also include requirements that the permittee develop a written stormwater management program (SWMP) documenting in detail how it intends to comply with the permit's requirements for each of the six "minimum control measures." Id. § 122.34(b). They are: (1) "public education and outreach on stormwater impacts"; (2) "public participation [and] involvement"; (3) "illicit discharge detection and elimination"; (4) "construction site stormwater runoff control"; (5) "post-construction stormwater management in new development and redevelopment"; and (6) "pollution prevention [and] good housekeeping for municipal operations." Ibid.; N.J.A.C. 7:14A-25.6(b).

If seeking coverage under a general permit issued by the NPDES permitting authority, as in this case, a small MS4 must submit a notice of intent (NOI) describing what minimum measures it will implement, and include a description of the BMPs to be implemented and the measurable goals for each of the BMPs, including timing and frequency. 40 C.F.R. §§ 122.33(b)(1)(i), 122.34(b)(5)(i)(c). BMPs are a control or effluent limitation in MS4 permits. See id. § 122.44(k)(2).

In 2016, the EPA revised its MS4 regulations to address the Ninth Circuit's partial remand of stormwater Phase II regulations. National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. 89,320 (Dec. 9, 2016) (codified at 40 C.F.R. § 122) (citing Envtl. Def. Ctr. Inc. v. EPA, 344 F.3d 832 (9th Cir. 2003)). The final rule established two alternative approaches to issuing NPDES general permits for small MS4s: the "Comprehensive General Permit," applicable here, or the "Two-Step General Permit." Ibid.; 40 C.F.R. § 122.28(d). Under the Comprehensive General Permit:

> [T]he permitting authority must establish in any small MS4 general permit the full set of requirements that are deemed necessary to meet the MS4 permit standard ("reduce pollutants to the [MEP], protect water quality and satisfy the appropriate water quality requirements of the [CWA]"), and the administrative record would include an explanation of the rationale for its determination. . . .
>
>    . . . .
>
> Regardless of which type of general permit is used to establish permit terms and conditions, every small MS4 general permit must include requirements that address the minimum control measures (§ 122.34(b)), water quality-based requirements where needed (§ 122.34(c)), and evaluation and assessment requirements (§ 122.34(d)). The final rule clarifies that all such terms and conditions must be expressed in terms that are "clear, specific, and measurable." The important attribute here is that permit requirements must be enforceable, and must provide a set of

9

performance expectations and schedules that are readily understood by the permittee, the public, and the permitting authority alike. For both types of general permits, requirements may be expressed in narrative or numeric form, as long as they are clear, specific, and measurable.

[NPDES Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,324, 89,326 (emphasis added).]

The EPA has described the approach to meet the MS4 permit standard in the preamble to the Phase II rule as an "iterative process" of developing, implementing, and improving stormwater control measures contained in SWMPs. National Pollutant Discharge Elimination System—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722, 68,754 (Dec. 8, 1999) (codified at 40 C.F.R. §§ 9, 122, 123, and 124).

A. The 2004 and 2009 MS4 Permits.

New Jersey adopted the EPA's Phase II rules for small MS4s and issued the first Tier A MS4 NJPDES Permit in 2004. N.J.A.C. 7:14A-25.6. The permit included statewide basic requirements (SBRs) and related BMPs designed to achieve the six minimum control measures identified in 40 C.F.R. § 122.34. It also included a provision for "additional measures," which, pursuant to N.J.A.C. 7:14A-25.6(e), are "non-numeric or numeric effluent limitations that are expressly required to be included in the stormwater program by an areawide or

Statewide water quality management plan . . . [as] adopted in accordance with N.J.A.C. 7:15." Additional measures may also be required by the DEP based on an adopted total maximum daily load (TMDL) report or a regional stormwater management plan adopted under N.J.A.C. 7:8. N.J.A.C. 7:14A-25.6(e)(1).

The 2004 permit included a provision for optional measures (OMs), which "are BMPs that are included at the municipality's discretion (in addition to any SBRs) that are intended to further prevent or reduce pollution of the waters of the state pursuant to N.J.A.C. 7:14A-25.6(i)." In 2005, the DEP issued a modification of the 2004 permit "to further develop and refine certain aspects of the permit."

In 2009, the permit was renewed and issued to 457 municipalities. The DEP made a number of "significant changes" to the 2004 permit, including the establishment of a point system for the local public education program and required adoptions and enforcement of an ordinance mandating the retrofitting of storm drain inlets by private entities when repaving parking lots or private roads. The 2009 permit expired on February 28, 2014, but was administratively continued in force pending completion of the renewal process under N.J.A.C. 7:14A-2.8.

B. The 2014 Petition.

In February 2014, appellant Delaware Riverkeeper Network and eight

other environmental groups submitted a petition to the DEP requesting "the modification (or revocation and reissuance)" of New Jersey's MS4 Permits pursuant to N.J.A.C. 7:14A-16.3. In August 2014, the EPA reviewed the DEP's MS4 permit and determined that the DEP had "a progressive MS4 permitting program with many commendable attributes," but "some modifications" to the Tier A MS4 permit were either required or recommended to comply with federal regulations. The DEP was "required to address the Ninth Circuit's partial remand of stormwater Phase II regulations regarding NOIs." In addition, the DEP was told to "make publicly available and review the [stormwater pollution prevention plans (SPPPs)] developed by each MS4," which were "also require[d] . . . to make their annual reports publicly available." The DEP was also required to "include a program evaluation provision in the MS4 general permits to document progress towards achieving measurable goals" and to "include water quality-based effluent limits in the MS4 general permits for MS4s with approved [wasteload allocations (WLAs)]." Finally, the DEP was required to integrate into the Tier A MS4 general permit several TMDL requirements.

C. The 2017 MS4 Permit at Issue.

The DEP issued a draft renewal of the MS4 comprehensive general permit in February 2017, including new requirements as well as clarifications and improvements to existing requirements. The DEP explained that a primary

objective of the MS4 stormwater program was to implement BMPs and other control measures, which would "serve to reduce the discharge of pollutants from the Tier A [m]unicipality's MS4, municipal maintenance yards and other ancillary operations, to the [MEP] pursuant to N.J.A.C. 7:14A-25.6(a)(1) and 40 C.F.R. § 122.34(a) to protect water quality and to satisfy the applicable water quality requirements of the [CWA]." The Tier A municipalities were required to submit an annual report and certification summarizing the status of compliance with the permit.

The DEP explained:

> This draft Tier A MS4 NJPDES permit is a Comprehensive General Permit (under 40 C.F.R. § 122.28) which requires Tier A [m]unicipalities to develop, update, implement and enforce a stormwater program (as documented in an SPPP) to ensure compliance with [SBRs], [o]ther [c]ontrol [m]easures, [a]dditional [m]easures, and [OMs]. The [DEP] provides an appropriate level of specificity in establishing Tier A NJPDES MS4 permit conditions by specifying BMPs, measurable goals, and implementation schedules for these SBRs and other measures. This provides Tier A [m]unicipalities, the public and regulators with clarity regarding what municipalities must do to comply with the permit.
>
> Without specific conditions, the Tier A MS4 NJPDES permit would be difficult to enforce and would give permittees little direction as to how to meet the requirements of State and Federal Rules.

Public notice for the draft renewal of the Tier A MS4 NJPDES permit was

published in the Press of Atlantic City, Courier-Post, Star-Ledger, and in the February 15, 2017, DEP Bulletin. The DEP held a public hearing on March 22, 2017. The public comment period closed on April 3, 2017. Thirty-three different parties, including appellants, submitted comments. The DEP responded to those comments and issued the final renewed MS4 Permit, with an effective date of January 1, 2018. The EPA has not objected to the permit.

## II. Standard of Review and Federal Compliance.

The scope of review of an administrative agency determination is limited. In re Stallworth, 208 N.J. 182, 194 (2011). To reverse the judgment of an administrative agency, we "must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'" Ibid. (alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579–80 (1980)). In reviewing the DEP's determination, we owe deference to the agency's expertise and to its reasonable construction of its enabling statute and regulations:

> The Legislature has entrusted to the DEP the enforcement of a complex system of water pollution control. We will ordinarily defer to an agency's construction of its enabling statute and its regulations, particularly where the Legislature has relied on the agency's expertise in enforcing a complex regulatory scheme. Accordingly, we give deference to [the] DEP's construction of the Water Pollution Control Act and to the agency's construction of its NJPDES regulations adopted pursuant to the Act.

14

> [SJC Builders, LLC v. State of N.J. Dep't of Envtl. Prot., 378 N.J. Super. 50, 54 (App. Div. 2005) (citations omitted).]

We review whether the agency's decision was lawful, rather than wise. See In re Adoption of Amendments to Ne., Upper Raritan, Sussex Cty., 435 N.J. Super. 571, 583–84 (App. Div. 2014).

A reviewing court "must give deference to the agency's findings of facts, and some deference to its 'interpretation of statutes and regulations within its implementing and enforcing responsibility.'" Utley v. Bd. of Review, Dep't of Labor, 194 N.J. 534, 551 (2008) (citation omitted) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)). "We are 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" Ibid. (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)). An agency cannot issue or deny a permit "absent satisfaction of the applicable statutory criteria." In re Authorization for Freshwater Wetlands Gen. Permits, 372 N.J. Super. 578, 596 n.8 (App. Div. 2004).

Appellants argue that the DEP's issuance of the permit is unlawful because it fails to include effluent monitoring as required by 40 C.F.R. § 122.44(i)(1). They argue that federal regulations require the DEP to include monitoring that measures the "mass and volume of pollutants," or end-of-pipe numerical effluent

monitoring.

The DEP's permit required BMPs as an acceptable form of effluent monitoring. 40 C.F.R. § 122.44(k); N.J.A.C. 7:14A-25.6(a)(1). The permit specifies the monitoring necessary to achieve compliance. For example, one permit requirement, expressed as a BMP, is that the permittee must "[d]evelop, update and implement a program to detect, investigate and control localized stream scouring from stormwater outfall pipes." To measure compliance, the permit requires that the permittee

> [c]ertify in each annual report that municipally owned outfall pipes have received the required visual inspection at least once every five years and maintain a log indicating the number and location of outfall pipes inspected, repairs prioritized, and repairs scheduled or performed. Certify in the annual report that a repair schedule has been prepared for those that have not been completed. Keep records required . . . in the SPPP.

Federal requirements for effluent monitoring include:

> (k) [BMPs] to control or abate the discharge of pollutants when:
>
>> (1) Authorized under section 304(e)[4] of the CWA for the control of toxic pollutants and

---

[4] This section authorizes the EPA to include BMPs in effluent guidelines for certain toxic or hazardous pollutants for the purpose of controlling "plant site runoff, spillage or leaks, sludge or waste disposal, and drainage from raw material storage." 33 U.S.C. § 1314(e).

hazardous substances from ancillary industrial activities;

(2) Authorized under section 402(p)[5] of the CWA for the control of stormwater discharges;

(3) Numeric effluent limitations are infeasible; or

(4) The practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA.

[40 C.F.R. § 122.44(k).]

BMPs are defined as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of 'waters of the United States.'" 40 C.F.R. § 122.2. The term "BMP" is intended to take on "a broad meaning." NPDES Municipal Separate

---

[5] This section provides:

Permits for discharges from municipal storm sewers—

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the [MEP], including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

[33 U.S.C. § 1342(p)(3)(B).]

A-1821-17T3

Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,337.

Consistent with federal law, the DEP, as a permitting authority, has implemented BMPs as opposed to numeric effluent limitations. Its decision to do so is also consistent with NJPDES regulations:

> [BMP] requirements are generally the most appropriate form of effluent limitations when designed to satisfy technology-based requirements (including reductions of pollutants to the [MEP]) and to protect water quality. Implementation of BMPs (other than OMs) consistent with the provisions of the stormwater program required . . . and the provisions of the NJPDES permit . . . constitutes compliance with the standard of reducing pollutants to the [MEP].
>
> [N.J.A.C. 7:14A-25.6(a)(1)]

In addition to effluent limitations, which may be expressed as BMPs, permits must also include "monitoring necessary to determine compliance." EPA, Memorandum on Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on those WLAs (Nov. 22, 2002) [hereinafter EPA 2002 Memorandum], https://www.epa.gov/sites/production/files/2015-07/ documents /final-wwtmdl.pdf. Under federal regulations, the permit must specify the "type, intervals, and frequency sufficient to yield data which are representative of the monitored activity including, when appropriate, continuous monitoring." 40 C.F.R. § 122.48(b).

18

Where stormwater permits contain effluent limitations expressed as BMPs, these permits should specify the monitoring necessary to determine if BMPs are achieving pollution reduction to the MEP. EPA 2002 Memorandum. To assess WLA implementation progress, the DEP's monitoring requirements "could include BMP effectiveness monitoring, outfall monitoring, or receiving water monitoring or NJDEP could require that MS4s demonstrate compliance with effluent limit BMPs through tracking of BMP implementation and modeling studies." Water quality monitoring is not necessarily required in every instance to assess compliance. NPDES Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,336. Numeric, end-of-pipe pollutant concentrations or loadings are not required to be included in permits. Ibid. The permitting authority has great flexibility in setting BMPs. See id. at 89,334–36.

The DEP also provided other reasons for its decision not to include requirements for numeric, end-of-pipe monitoring in its permit. First, it explained in its response to appellants' comment that this type of monitoring was not needed because of the permit's requirements for data and information collection and reporting, which the DEP maintained was the most appropriate form of monitoring. The DEP further stated:

> It is worth noting that some municipalities are responsible for hundreds of MS4 stormwater outfalls

19

and the intermittent nature of stormwater discharges presents challenges to the collection of representative samples. At this time, end-of-pipe monitoring requirements would require Tier A municipalities to divert resources that would otherwise be used to implement BMPs to reduce the discharge of pollutants.

Finally, the DEP conducted a "wide array of ambient monitoring for freshwater (rivers, streams, lakes), marine waters (bays, oceans) and tidal rivers," and that monitoring is conducted for "chemical/physical parameters; biological health (e.g., bottom-dwelling communities, fish populations); phytoplankton (microscopic plants) and sanitary quality (indicator of human health risk)."

Appellants cite to federal cases for the proposition that EPA regulations require monitoring. Those cases do not hold, however, that BMPs are insufficient as monitoring tools, or that numeric, end-of-pipe monitoring is required to be included in a permit.

For example, Natural Resources Defense Council, Inc. v. EPA, 808 F.3d 556 (2d Cir. 2015) concerned a permit that regulated the discharge of ballast water from ships. Id. at 561. The EPA required the monitoring of "functionality" of a vessel's ballast water treatment system and of the concentrations of two specific types of bacteria. Id. at 581. Although the environmental organizations advocated for the alternative of "direct monitoring," the Second Circuit reasoned that dischargers did not have the

20

capacity to quantify living organisms of certain size classes. Id. at 582. Moreover, the current technology would require an analysis that was "prohibitively expensive and impractical." Ibid. The Second Circuit deferred to the EPA in light of no "feasible" alternative. Id. at 582–83.

The EPA wrote regulations with the understanding that not every permit limitation could be measured in terms of mass or volume. See 40 C.F.R. § 122.44(i)(1)(i). As Maryland has recognized, "[f]lexibility is a hallmark in designing MS4 permits." Md. Dep't of Env't. v. Anacostia Riverkeeper, 134 A.3d 892, 936 (Md. 2016).

"'[M]easurable' does not necessarily mean that . . . numeric, end-of-pipe pollutant concentrations or loadings must be included in permits." NPDES Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,336. "Rather, the term 'measurable' means that the permit requirement has been articulated in such a way that compliance with it can be assessed in a straightforward manner." Ibid.

In choosing to implement BMPs, the DEP complied with both federal and state regulations regarding effluent limitations. Contrary to appellants' arguments, numeric, end-of-pipe effluent limitations are not required in permits. 33 U.S.C. § 1342(p)(3)(B); 40 C.F.R. § 122.44; N.J.A.C. 7:14A-25.6(a)(1). The DEP complied with federal regulations regarding monitoring, which includes

A-1821-17T3

BMPs. NPDES Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,336.

### III. Measures to Ensure Compliance.

Appellants argue that the MS4 permit fails to specify monitoring requirements, including effluent monitoring, sufficient to assess compliance with permit limitations. An example of a monitoring requirement in the DEP's permit can be found in Part IV.B.5, "Minimum Standards for Pollution Prevention/Good Housekeeping for Municipal Operators," which requires Tier A municipalities to adopt and enforce various community-wide ordinances, such as pet waste ordinances, wildlife-feeding ordinances, and litter control ordinances. The measurable standard for these ordinances is to "[c]ertify in each annual report the date the ordinance was adopted and that it is being enforced. A log of enforcement actions shall be kept in the SPPP." The DEP is able to verify compliance with this standard by reviewing annual reports and enforcement logs, as well as through the municipal stormwater audit process. The municipal stormwater audit process allows the DEP "to better evaluate municipalities' compliance with the requirements of the Tier A permit and identify areas of concern where municipalities can improve the implementation of their municipal stormwater management program."

The permit also incorporates a Tier A Municipal Stormwater Guidance

Document, which provides "sample model ordinances that may be downloaded at https://www.nj.gov/dep/dwq/tier_a_model_ord.htm, and are available for use by a Tier A municipality to assist in developing local regulations." New Jersey Department of Environmental Protection, Division of Water Quality, Tier A Municipal Stormwater: Guidance Document ch. 3.5 (October 2018), https://www.nj.gov/dep/dwq/pdf/Tier_A/Tier_A_Guidance.pdf. Tier A municipalities are required to adopt and enforce either the model ordinance or a different ordinance that meets the minimum standard. Ibid. The DEP explained that flexibility is given because many of the community wide ordinances "require specific knowledge of the community and its residents."

"In order for permit language to be clear, specific, measurable and enforceable, each [p]ermit [r]equirement will ideally specify: [w]hat needs to happen; [w]ho needs to do it; [h]ow much they need to do; [w]hen they need to get it done; and [w]here it is to be done." National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System General Permit Remand, 81 Fed. Reg. 415, 422 (Jan. 6, 2016) (codified at 40 C.F.R. § 122).

Accompanying the promulgation of the requirement that permit terms and conditions be "clear, specific, and measurable," the EPA published a compendium of permit examples, which included provisions from the EPA and

state MS4 general permits that provided examples of clear, specific, and measurable requirements. EPA, Compendium of MS4 Permitting Approaches: Part 1: Six Minimum Control Measures (Nov. 2016), https://www.epa.gov/sites/production/files/2017-01/documents/part1-epa_compendium_of_ms4_general_permit_requirements_508.pdf. The EPA also identified the types of permit language that would not qualify as clear, specific, and measurable. NPDES Municipal Separate Storm Sewer System General Permit Remand, 81 Fed. Reg. at 423.

As for the word "specific," the EPA explained that it intended for that word to mean "that a permitting authority describes in enough detail that an MS4 can determine from permit terms and conditions what activity they need to undertake, when or how often they must undertake it, and whether they must undertake it in a particular way." NPDES Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,335. "[I]t is not necessary that every detail be spelled out in a permit as an enforceable requirement under the CWA." Id. at 89,336.

As for the word "measurable," the EPA clarified that "'measurable' does not necessarily mean that water quality monitoring must be required in every instance to assess compliance." Ibid. "[I]t does not mean that numeric, end-of-pipe pollutant concentrations or loadings must be included in the permits." Ibid.

A-1821-17T3

Contrary to appellants' arguments, the DEP's permit requirements are clear, specific, and measurable, and thus, as the DEP indicated, it will be able to assess and evaluate compliance through tracking of measurable goals, implementing BMPs, on-site audits conducted by the DEP staff, the submission of annual reports, and the ambient monitoring program.

The EPA "intend[ed] for the permitting authority to retain discretion in determining how much specificity is needed for different permit requirements." Id. at 89,335. The EPA recognizes that the level of specificity depends on the particular factors at play in the permit area. Id. at 89,336. Thus, in giving Tier A municipalities some flexibility, the DEP did not violate federal law.

The DEP strengthened its final permit based on the recommendations given by the EPA, which included the addition of more specific monitoring obligations. The DEP included in the final permit a requirement for Tier A municipalities to annually identify pollutants listed in any approved or adopted TMDL[6] report for water bodies bordering or within the Tier A Municipality for inclusion in the SPPP and to identify strategies to address sources of stormwater-related pollutants.

Each permittee must also certify in an annual report that: (1) approved or

---

[6] A list of approved and adopted, or approved but not yet adopted TMDLs can be found at https://www.nj.gov/dep/dwq/msrp-tmdl-rh.htm.

adopted TMDLs have been identified and reviewed and stormwater related pollutants identified; (2) the municipality has prioritized stormwater facility maintenance, and identified and developed strategies to address specific sources of stormwater-related pollutants contributing to discharges; (3) the municipality has updated its SPPP accordingly; and (4) the municipality has incorporated OMs.

The permit also provides that additional measures will be included if the TMDL so requires. These regulations provide the permitting agency the authority to include more stringent terms and conditions in addition to the minimum control measures based on approved TMDLs, as well as the discretion to set other applicable requirements to account for TMDLs and WLAs as appropriate. The DEP's permit meets these requirements and contains sufficient clear, specific, and measurable measures to ensure compliance.

IV. <u>Wasteload Allocation (WLA).</u>

Appellants argue that the permit did not comply with federal regulations because it failed to include effluent limits consistent with WLAs previously adopted by the DEP. They contend that 40 C.F.R. §122.44(d)(1)(vii)(B) obligated the DEP to require that effluent limits be "consistent with the assumptions and requirements of any available [WLA]." They claim that the DEP violated this regulation because it did not examine available WLAs. 40

C.F.R. § 122.44(d)(1)(vii)(B) requires consistency with the requirements of any WLA developed and approved for a particular discharge.  It provides:

> When developing water quality-based effluent limits . . . the permitting authority shall ensure that . . . [e]ffluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available [WLA] for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7.
>
> [Ibid.]

"Subparagraph (vii) does not prescribe detailed procedures for developing water quality-based effluents limits.  Rather, the regulation prescribes minimum requirements for developing water quality-based effluent limits and, at the same time, gives the permitting authority the flexibility to determine the appropriate procedures for developing water quality-based effluent limits."  National Pollutant Discharge Elimination System; Surface Water Toxics Control Program, 54 Fed. Reg. 23,868, 23,879 (June 2, 1989) (codified at 40 C.F.R. §§ 122, 123, and 130).  WLAs require translation into permit limits, such as water quality-based effluent limits.  In re City of Moscow, Idaho, 10 E.A.D. 135, 146–47 (EAB 2001).

The Environmental Appeals Board rejected the City of Moscow's petition for review of an EPA-issued NPDES permit.  Id. at 172.  The Board concluded that the EPA did not err in creating permit limits although the EPA did not

27

incorporate the design flow rate of an applicable TMDL. Id. at 146–48. After reviewing 40 C.F.R. § 122.44(d)(1)(vii)(B) and the regulatory history, the Board explained that no law or rule prescribed how the EPA was to select a flow rate to create effluent limits. Ibid. The Board concluded that the agency acted "well within the discretion accorded [it] under the applicable regulatory scheme." Id. at 148.

The overarching federal law for MS4s—33 U.S.C. § 1342(p)(3)(B)(iii) — is broad and flexible. It does not require the DEP to implement numeric effluent limitations; BMPs are appropriate.

Currently, no existing TMDLs require numeric water quality-based effluent limits, but that does not mean that no controls are in place to ensure water quality. In fact, the DEP stated that "SBRs and other control measures that Tier A [m]unicipalities are required to implement are designed to minimize pollutant loadings in all watersheds including impaired watersheds. Each SBR contains specific requirements, each of which is targeted at reducing the discharge of pollutants." The DEP has determined that for water bodies with approved or adopted TMDLs, the reductions associated with compliant implementation of each SBR are sufficient to meet the reductions specified in the TMDLs.

## V.  The DEP's Use of Best Management Practices (BMPs).

Appellants argue that the DEP violated federal law by failing to provide adequate support in the administrative record for its decision to implement BMPs rather than numeric effluent limits in the MS4 permit.  Prior to proposing the MS4 permit, the DEP reviewed the existing municipal stormwater programs and the EPA's MS4 Permit Improvement Guide, in an effort to improve upon the 2009 permit.  The DEP reviewed compliance evaluations, annual reports and certifications, supplemental questionnaires, input from outreach sessions, and municipal stormwater audits.  It expressly explained its reasons for choosing to implement BMPs rather than numeric effluent limitations.

## VI.  Clear, Specific, and Measurable Terms.

Appellants argue that the DEP "violated EPA regulations by failing to express the permit requirements in 'clear, specific, and measurable' terms" as required by 40 C.F.R. § 122.34(a).  First, appellants take issue with the permit requirements relating to the implementation of community-wide ordinances, such as the yard waste ordinance and litter ordinance.  Contrary to appellants' argument, the permit language is sufficiently "clear, specific, and measurable" to ensure compliance, and thus, satisfies 40 C.F.R. § 122.34(a).

The DEP is able to verify compliance with this standard by reviewing annual reports and enforcement logs, as well as through the municipal

29

stormwater audit process. As determined by the DEP, further specificity would be "impracticable and inappropriate," considering the differences among municipalities. Specific knowledge of the community and its residents is needed in order to enact a municipal ordinance that will meet the requirements of the permit.

Appellants argue that the "DEP's failure to require a minimum frequency for yard waste pickups" is improper. As explained by the DEP, "a one-size-fits-all" yard waste pickup schedule "for hundreds of Tier A municipalities [is] impracticable and onerous." The DEP further explained: "Flexibility in scheduling is necessary in a yard waste pick-up program to accommodate for site-specific factors such as limited or changing municipal resources, equipment breakdown, weather, and topographic differences." The permit does require the permittee to either:

> (1) [a]dopt and enforce an ordinance that prohibits placing non-containerized yard wastes . . . into the street; or (2) develop and implement a non-containerized yard waste collection and disposal program that includes adoption and enforcement of an ordinance that prohibits placing non-containerized yard waste at the curb or along the street within [ten] feet of any storm drain inlet and at any time other than a set yard waste collection schedule.

The permit also requires the permittee to set a yard waste collection schedule that is provided to all municipal residents and businesses. To measure

30 <span>A-1821-17T3</span>

compliance, the DEP requires the permittee to certify in each annual report the date the ordinance was adopted and that it is enforced. This requirement is thus "clear, specific, and measurable" as per 40 C.F.R. § 122.34(a).

Appellants also take issue with the permit requirements pertaining to litter control. They argue that "[i]f a municipality wishes to adopt its own litter ordinance in lieu of the state litter statute, there is no way to measure whether a given litter ordinance is being 'enforced' within the terms of the permit." Permittees are required to certify in their annual report the date the ordinance was adopted and that it is being enforced. More specificity is impracticable and inappropriate because a community-wide measure, like litter control, requires specific knowledge of the community and its residents.

Next, appellants argue that the stormwater facilities maintenance provision of the permit contains no measurable requirement. The permit requires the permittee to ensure that stormwater facility maintenance is performed consistent with any maintenance plans, or more frequently as needed, to ensure the proper function and operation of the stormwater facility. The permittee is required to maintain a log of inspections and any preventative and corrective maintenance performed, as well as certify in each annual report that the municipality has "developed, updated, implemented and enforced a program to ensure adequate long-term cleaning, operation, and maintenance of

stormwater facilities not owned or operated by the municipality, not subject to the conditions of another NJPDES stormwater permit and constructed after February 7, 1984." The permit also refers to the DEP's maintenance guidance, which provides examples of maintenance tasks and performance schedules, and templates of inspection and maintenance logs. The stormwater facilities maintenance provision is sufficiently clear, specific, and measurable to satisfy federal requirements.

Finally, appellants claim that there are no specific or measurable permit standards by which to determine whether a permittee has developed strategies to address specific sources of stormwater-related pollutants contributing to discharges using the TMDL information. Permittees are required to "annually review approved or adopted TMDL reports to identify stormwater related pollutants listed therein and associated with any segment of surface water wholly or partially within or bordering the Tier A Municipality." The permittee is then required to use that information to, "at a minimum, (1) assist in the prioritization of stormwater facility maintenance including schedules for repairs . . . and (2) identify and develop strategies to address specific sources of stormwater related pollutants contributing to discharges authorized under [the] . . . permit." Examples of strategies are provided in the "[TMDL] Guidance for Tier A MS4 Permittees." The information learned and the strategies developed

32

are then required to be incorporated into the permittee's SPPP and included as OMs in the permit. As the DEP explained, these measures, in addition to the SBRs, when properly implemented, "achieve a substantial portion of the required load reductions." These numerous measurable requirements associated with TMDL information, satisfy federal requirements.

## VII. Maximum Extent Practicable (MEP).

Appellants argue that the DEP failed to include "all necessary permit terms and conditions to reduce the discharge of pollutants from the MS4 to the [MEP]." 40 C.F.R. § 122.34(a) states that the requirements of the permit must be expressed in "clear, specific, and measurable terms" to "reduce the discharge of pollutants from the MS4 to the [MEP]," and that "implementation of specific tasks or [BMPs], BMP design requirements, [and] performance requirements" will meet the MEP standard.

The "MEP" standard has not been precisely defined. The EPA has stated that this phrase was intentionally left undefined "to allow maximum flexibility in MS4 permitting. MS4s need the flexibility to optimize reductions in stormwater pollutants on a location-by-location basis. . . . Therefore, each permittee will determine appropriate BMPs to satisfy each of the six minimum control measures through an evaluative process." NPDES Regulations for Revision of the Water Pollution Control Program Addressing Storm Water

Discharges, 64 Fed. Reg. at 68,754.

The "[MEP] standard should be applied in a site-specific, flexible manner, taking into account cost considerations as well as water quality effects." Id. at 68,732 (emphasis added). "[W]hat constitutes compliance will by necessity change over time." NPDES Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,342.

The permit contains multiple examples of BMPs that are designed to reduce pollution to the MEP as required by federal law. The DEP stated that it made multiple improvements to the 2009 permit, including "improved permit language, new requirements, such as enhanced training, improved recordkeeping for stormwater facility maintenance, expansion of [l]ocal [p]ublic [e]ducation and [o]utreach, expanded requirements for municipal maintenance yards, and [TMDL] requirements." These changes reflect the DEP's effort to continue to reduce pollution to the MEP, and thus, the permit satisfies federal requirements in that regard.

## VIII. Meaningful Review.

Appellants maintain that the "DEP failed to provide for meaningful review to ensure that each MS4 program reduces the discharge of pollutants" to the MEP as required under federal law. Appellants cite to permit section IV.C.2.a, which requires the development of a pollution reduction strategy by requiring

34

Tier A municipalities to use TMDL information to "identify and develop strategies to address specific sources of stormwater related pollutants contributing to discharges" authorized under the permit.

The DEP did include meaningful review measures in the permit for all sections. Permittees are required to complete an annual report, including any supplemental questions, which summarizes the status of compliance with the conditions of the permit. The Municipal Stormwater Program Coordinator is required to certify, sign and date the report, and make it available to the DEP for inspection. The DEP is thus able to conduct a meaningful review of all strategies implemented. In addition, the DEP conducts a wide array of ambient monitoring for freshwater, marine waters, and tidal rivers. If water quality standards are not met, the DEP may review a permittee's permit and SPPP, and make revisions.

IX. Public Accountability.

Federal and state regulations require that the permit address the need for the public to be included in developing, implementing, and reviewing the stormwater management program. 40 C.F.R. § 122.34(b); N.J.A.C. 7:14A-25.6(b)(1). Members of the public may participate in program development and implementation by "serving as citizen representatives on a local stormwater management panel, attending public hearings, working as citizen volunteers to

35

educate other individuals about the program, assisting in program coordination with other pre-existing programs, or participating in volunteer monitoring efforts."  40 C.F.R. § 122.34(b)(2)(ii).

Consistent with this requirement, the DEP's permit includes "Minimum Standards for Public Involvement and Participation Including Public Notice." This section provides, in pertinent part:

> Tier A [m]unicipalities shall comply with applicable State and local public notice requirements when providing for public participation in the development and implementation of a MS4 stormwater program. Requirements include but are not limited to:
>
> The Open Public Meetings Act ("Sunshine Law," N.J.S.A. 10:4-6 to -21);
>
> Statutory procedures for the enactment of ordinances (N.J.S.A. 40:49-2), including the municipal stormwater control ordinance and other ordinances adopted to comply with Part IV of this permit; and
>
> The Municipal Land Use Law concerning the adoption or amendment of the [municipal stormwater management plan (MSWMP)] (N.J.S.A. 40:55D-13, 28, and 94), and the review of applications for development (N.J.S.A. 40:55D-12).  The Tier A [m]unicipality shall also ensure that applicants for development meet the notice requirements of N.J.S.A. 40:55D-12.
>
> Tier A [m]unicipalities shall make elements of its MS4 stormwater program available to the public:
>
> Provide the current (SPPP) upon request . . . ;

> Post the current SPPP on its website . . . ; and

> Post the current MSWMP and all ordinances required by this permit on its website or otherwise comply with the notification requirements of N.J.A.C. 7:8-4.4(e).

The permit provides for and encourages public participation by requiring permittees to comply with local notice and participation laws and by requiring the public posting of the SPPP and MSWMP. Importantly, it is the permit and not the SPPP which regulates the discharge of municipal stormwater, and thus, the permittee is not required to develop the SPPP in a public forum. The permit details the specific requirements municipalities should implement to meet the six minimum controls and the statewide basic requirements. In contrast, the SPPP is a "living document," required to be updated annually. It serves to document the implementation of the specific permit requirements, and the public has the opportunity to participate in its development by attending public hearings on ordinances or working as volunteers. The DEP followed all public participation requirements.

We affirm the DEP's final determination to renew the MS4 general permit, which complies with all federal and state requirements.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION